**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MARCELL LEAK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 15 C 3643 |
| v. | ) | |
| | ) | Judge Jorge L. Alonso |
| DUANE A. WADSWORTH, individually, | ) | |
| and as agent of EAGLE RIDGE | ) | |
| TRANSPORTATION, INC., individually, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

On March 27, 2015, plaintiff, Marcell Leak, filed this negligence action against defendants for injuries he suffered when Duane Wadsworth's truck collided with Leak's truck. On April 24, 2015, defendants, Wadsworth and his employer, Eagle Ridge Transportation, Inc., removed the case from the Circuit Court of Cook County. The case proceeded to a bench trial that the Court conducted from November 14 to 16, 2016. The Court heard the parties' opening and closing arguments and testimony from several witnesses[1] and admitted a number of exhibits into evidence. The parties submitted proposed findings of fact and conclusions of law after trial. Plaintiff asks the Court to award him: (1) $170,479.35 for medical expenses; (2) $175,000 for pain and suffering; (3) $125,000 for loss of a normal life; and (4) $72,095.50 in lost wages, for a total of $542,574.85. Defendant counters that plaintiff has not proven by a preponderance of the evidence that the May 7, 2013 accident caused his injuries. After considering the evidence and for the reasons set forth below pursuant to Federal Rule of Civil Procedure 52(a), the Court enters judgment in favor of plaintiff and against defendant in the amount of $222,025.83.

---

[1] The live witnesses at trial were Adrienne Leak, Marcell Leak, and Duane Wadsworth. The testimony of Paul Czapar, Charles Bodem, Dr. Axel Vargas, Dr. Gunnar Andersson, and Dr. Sean Salehi was presented via videotaped depositions.

# FINDINGS OF FACT

**May 7, 2013 Collision**

This case arises from a collision that occurred on the evening of May 7, 2013, at a Pilot truck stop in Bloomington, Illinois. (Leak Trial Testimony at 5 ll. 4-10, 23-24.) At the time, Leak was a truck driver for Schneider National and had stopped in Bloomington to take his federally-mandated ten-hour break. (*Id*. at 3 ll. 5-8, 6 ll. 1-8.) After eating dinner and talking to his wife on the phone, Leak went to sleep in his truck. (*Id.* at 6 ll. 17-21.) Leak's truck was parked in the last slot in the row; there was a truck parked immediately to the left, but no truck on the right. (*Id.* at 7 l. 17-8 l. 5.) Wadsworth, a driver for Eagle Ridge, pulled into the Pilot truck stop later that evening to take his mandated break and, while looking for a parking spot, altered course, causing his truck's trailer to drag across Leak's trailer.[2] (Wadsworth Trial Testimony at 4 ll. 10-16, 6 ll. 4, 7-16, 7 l. 17-8 l. 23.) As soon as Wadsworth realized his truck had made contact with another truck, he backed up. (*Id.* at 10 ll. 11-12.) While backing up, Wadsworth's trailer caused Leak's truck to move sideways about eighteen inches, causing it to come into contact with the mirror of the truck next to it. (*Id*. at 11 ll. 10-14.)

When Wadsworth's truck collided with Leak's, Leak was awoken by a loud bang and found the cabin of his truck shaking. (Leak Trial Testimony at 8 ll. 22-23.) He immediately got out of bed and fell backwards because the truck was still shaking. (*Id.* at 9 ll. 5-6.) Leak got up and made his way to the front of the truck, looked out the driver's window, and saw that another trailer had hit his truck. (*Id.* at ll. 9-22.) When Wadsworth put his truck in reverse and dragged Leak's truck, Leak lost his balance and fell backwards again. (*Id.* at 10 ll. 9-17.) Leak got up and "felt a sharp pain" in his back and got out of the truck to assess the damage. (*Id.* at 11 ll. 2-

---

[2] The defendants admit liability for the accident [90].

10.)  Leak then went back to his truck and called emergency personnel.  (*Id*. at 14 ll. 2-3.)  An EMT arrived ten to fifteen minutes later and asked whether Leak wanted to go to the hospital. (*Id*. at ll. 6-17.)  Leak told the EMT that he had hit his head and "had a sharp pain" in his back and wanted to be seen by a doctor.  (*Id*. at ll. 12-20.)  Leak was taken to BroMenn Advocate Medical Center, where he received a CT scan.  (*Id.* at l. 22-15 l. 6.)  When the CT scan came back clear, Leak was discharged.  (*Id.* at 15 ll. 6-15.)  Wadsworth testified that the day of the accident, Leak did not speak to him and that the next day, he observed Leak bending or squatting while looking under the trailer as it was being towed away.  (Wadsworth Trial Testimony at 11 ll. 15-18, 12 ll. 12-24.)

**Medical Treatment**

*Paul Czapar*

Czapar was the City of Bloomington paramedic who was dispatched to the Pilot truck stop on the day of the collision.  (Czapar Dep. at 11 ll. 7-9, 16 ll. 8-21.)  Czapar noted that when he arrived on the scene, Leak was "standing up, walking around . . . [and] did not appear to be . . . injured."  (*Id*. at 26 ll. 1-3.)  While Leak indicated that he wanted to be taken to the hospital, he did not tell Czapar that he was having head, neck, or back pain.  (*Id*. at 27 ll. 9-16.)  According to Czapar, Leak walked unassisted to the ambulance.  (*Id*. at 33 ll. 8-21.)

*Charles Bodem*

A few days after the accident, Leak's aunt referred him to the Injury Care Network because he told her he was experiencing back pain.  (Leak Trial Testimony at 16 ll. 2-17.)  The Injury Care Network connected Leak with Charles Bodem, a chiropractor whom he first saw on May 9, 2013.  (*Id.* at ll. 2-3; Bodem Dep. at 12 ll. 20-22.)  Bodem's notes from that appointment indicate that "[w]hen the patient got up to find out what was going on [during the truck

collision], he lost his balance and fell backward and landed on his back striking his head on the ground.  And then he felt immediate onset of head, neck and lower back pain."  (Bodem Dep. at 13 ll. 10-14.)  Bodem's notes do not indicate that Leak fell twice, and he did not recall Leak so stating.  (*Id.* at 59 ll. 4-7.)  Bodem testified that his examination revealed that Leak had "moderate to severe difficulty with his postural transition . . . and reduced active range of motion in his neck . . . and lower back[.]"  (*Id*. at 14 ll. 13-22.)  Bodem also noted that Leak had pain in his neck and both sides of his lower back along with muscle spasms in his lower back.  (*Id*. at 15 l. 20-16 l. 1.)  Based on Leak's history and Bodem's examination, Bodem diagnosed Leak with cervicalgia,[3] lumbar radiculitis,[4] inflammation in the nerve in the lumbar spine, lumbalgia,[5] and a head injury.  (*Id.* at 16 ll. 12-14.)  That day Leak was treated with electric stem[6] and cold packs to reduce inflammation.  (*Id.* at 18 ll. 3-5, 14-15.)  Bodem also recommended that Leak have an MRI of his lumbar spine[7] and make six chiropractic visits,[8] and he referred him to a pain-management doctor.  (*Id.* at 17 ll. 1-5.)  Finally, Bodem "took [Leak] off of work for two weeks."  (*Id*. at 19 ll. 22-23.)

---

[3] Bodem defined cervicalgia as neck pain.  (Bodem Dep. at 16 ll. 15-16.)

[4] Lumbar radiculitis is a term used to describe neurological symptoms for a suspected pinched nerve.  (Bodem Dep. at 62 ll. 2-5.)

[5] Bodem defined lumbalgia as lower back pain.  (Bodem Dep. at 16 ll. 17-18.)

[6] Electric stem is an "electrical device that sends electricity into the area that is injured and produces a pain relieving effect."  (Bodem Dep. at 18 ll. 17-19.)

[7] Leak had two MRIs on May 15 that were unremarkable, or normal.  (Bodem Dep. at 65 ll. 5-18.)

[8] Bodem saw Leak 42 times from May 9 to September 5 and accrued approximately $12,000 in costs.  (Bodem Dep. at 67 l. 24-68 l. 2, ll. 14-17.)

Leak returned for a follow-up appointment the next day and had electrical stimulation of the lower back, chiropractic manipulation, kinesio taping[9] and was also shown lower back and neck exercises.  (*Id*. at 19 ll. 13-16, 21 at ll. 3-5.)  Bodem re-examined Leak on May 20, 2013, and reported that the intensity of Leak's pain had lessened and his ability to move had improved.  (*Id*. at 23 l. 13-24 l. 6.)  Bodem's diagnoses remained the same, and he recommended that Leak continue with another month of chiropractic visits and remain off work.  (*Id*. at 24 ll. 9-15, 25 at ll. 11-13.)  Bodem examined Leak again on June 18, 2013, and reported that Leak's pain was reduced and his mobility had improved.  (*Id*. at 27 ll. 4-20.)  Leak experienced the worst pain in his lower back.[10]  (*Id*. at l. 24.)  Bodem recommended an additional month of chiropractic visits and that he remain off work.  (*Id*. at 31 ll. 1-11.)  At a third examination on July 24, 2013, Leak's pain and range of motion had again improved.  (*Id*. at ll. 12-21.)  Bodem kept Leak off work for another month and recommended continued chiropractic visits.  (*Id*. at 35 at ll. 11-15, 22, 36 ll. 3-5.)

At a visit on July 29, Leak reported an increase in lower back pain.  (*Id*. at 36 l. 22-37 l. 4.)  Both Leak and Bodem attributed the pain to an increase in the intensity of the chiropractic exercises in which Leak was engaging, and Bodem lessened the intensity of the exercises.  (*Id*. at 37 ll. 5-15.)  At Leak's August 29th visit, Bodem referred Leak for a Needle EMG[11] and at an exam in September, Leak reported his back pain as the same intensity as the July 29 visit.  (*Id*. at ll. 23-24, 40 l. 14.)  Bodem testified that he believed Leak's injuries, pain, need to stay off work,

---

[9] Kinesio tape is used on the lower back to improve circulation.  (Bodem Dep. at 22 ll. 6-11.)

[10] At the May 9 examination, Leak rated his back pain an 8 out of 10.  (Bodem Dep. at 28 ll. 21-22.)  At the June 18 exam, Leak rated his back pain a 6 out of 10.  (*Id*. at 29 ll. 22-24.)

[11] An EMG (electromyography) is a diagnostic technique for recording the extracellular activity of skeletal muscles at rest, during voluntary contractions, and during electrical stimulation.  *Dorland's Illustrated Medical Dictionary* (32nd ed. Elsevier Saunders 2012), *available at* www.dorlands.com (last accessed June 29, 2017).

and the course of treatment he recommended were caused by the accident on May 7, 2013. (*Id.* at 45 ll. 18-47 l. 24.) Bodem discharged Leak from his care on September 5, 2013. (*Id*. at 73 ll. 3-6.)

*Dr. Axel Vargas*

Vargas first saw Leak on May 15, 2013 at the Chicago Pain Orthopedic Institute upon a referral from Charles Bodem. (Vargas Dep. at 14 ll. 16-22, 53 ll. 19-23.) At that appointment, Leak reported that he had fallen off the cab bed, hitting his head and lower back when another truck collided with his. (*Id*. at 16 ll. 5-13.) He also complained of sharp, shooting lower back pain that radiated to his upper legs, as well as non-radiating neck pain. (*Id*. at 18 ll. 15-23.) Vargas's impression was that Leak had lumbrosacral and cervical facet[12] pain syndrome. (*Id.* at 22 ll. 11-13.) Vargas recommended a facet joint injection to confirm the diagnosis. (*Id.* at ll. 17-21.) Leak's complaints of pain remained the same when he next visited Vargas on June 13, and Vargas again recommended diagnostic facet joint injections. (*Id.* at 23 ll. 14-21.) Leak finally received the facet joint injection on July 2, 2013. (*Id*. at 25 ll. 18-23.) When Vargas saw Leak for a follow-up appointment on July 25, Leak reported that he had experienced substantial relief for approximately ten days after the injection. (*Id.* at 26 ll. 19-20, 27 ll. 2-9.) Vargas stated that this report confirmed his diagnosis, and he then recommended that a medical branch nerve block be administered in two phases. (*Id*. at 28 ll. 14-22.) Leak received the first medical branch block on August 6 and the second on September 5. (*Id*. at 29 ll. 16-20, 30 ll. 6-11.) The first branch block decreased Leak's pain for approximately ten days. (*Id*. at 31 ll. 3-8.) The second branch block, which used a different numbing agent, also decreased Leak's pain and lasted approximately two days. (*Id*. at ll. 9-16.) Based on those results, Vargas recommended that

---

[12] A facet is a type of joint. This particular joint connects the upper and lower back. (Vargas Dep. at 23 ll. 3-11.) It controls some of the motion of the spine. (Andersson Oct. 2016 Dep. at 9 ll. 17-19.)

Leak undergo radiofrequency ablation.[13]   (*Id*. at ll. 20-22.)   At a visit on October 25, Leak remained the same, and on November 5 and 26, he underwent the radiofrequency ablation.  (*Id.* at 32 ll. 12-17, 33 ll. 8-10, 34 ll. 6-8.)

Vargas saw Leak next on January 8, 2014, when he reported that a few days after the ablation, he had experienced "clear and sustained" improvement in his back pain.  (*Id*. at 34 ll. 16-24.)  Leak further reported that four weeks prior to the visit, most of his initial back pain symptoms had returned because of a near fall.  (*Id*. at 35 ll. 6-10.)  Vargas noted that Leak complained of lower back pain shooting into his extremities that was not present at previous visits.  (*Id*. at 35 l. 23-36 l. 15.)  Vargas attributed the shooting pain to the near fall and recommended that Leak meet with a neurologist.  (*Id*. at 36 l. 16-37 l. 1.)  Leak had an MRI on January 14, which revealed disc protrusion that had not been present on prior MRIs.  (*Id*. at 37 ll. 9-11, 83 ll. 6-17.)  At a visit on January 30, Vargas performed a diagnostic lumbar discogram.[14] (*Id*. at 38 ll. 5-7.)  At a follow-up visit on February 14, Leak again complained of back pain shooting into his extremities, and Vargas repeated his recommendation of neurological treatment.  (*Id*. at 39 ll. 16-24.)  Dr. Dickson, a neurosurgeon, evaluated Leak on March 12 and recommended a laminectomy[15] of a specific disc, which Leak opted not to undergo.  (*Id*. at 40 ll. 12-16.)  Leak saw Vargas again on April 11 and for the last time on June 13 and continued to

---

[13] Radiofrequency ablation is a pain-management technique during which high-frequency, low-intensity current is administered to a specific area to stop pain transmission in the nerves.  (Vargas Dep. at 29 ll. 6-10.)

[14] The purpose of this diagnostic test is to correlate the patient's pain with a specific disc.  (Vargas Dep. at 38 ll. 9-12.)

[15] A laminectomy is the excision of the posterior arch of a vertebra.  *Dorland's Illustrated Medical Dictionary* (32nd ed. Elsevier Saunders 2012), *available at* www.dorlands.com (last accessed June 29, 2017).

report back pain shooting into his extremities.  (*Id*. at 40 l. 7, 41 ll. 2-5.)  According to Vargas, Leak's pain and injuries were caused by the May 7, 2013 collision.  (*Id.* at 41 l. 17-42 l. 4.)

*Dr. Gunner Andersson*

Leak first saw Andersson on August 27, 2013, for an independent medical evaluation at the request of Leak's employer.  (Andersson Jan. 2016 Dep. at 10 ll. 4-8, 11 ll. 2-3, 54 ll. 1-10.) Andersson reviewed Leak's May 2013 MRIs and concluded that they were normal for a twenty-six year old.  (*Id*. at 13 ll. 10-24.)  Andersson also testified that based on the MRIs, he found no abnormalities in Leak's facet joints, and he did not agree with the conclusion that Leak needed facet joint injections.  (*Id*. at 22 ll. 8-18.)  Andersson's examination of Leak revealed almost normal flexion, but he could not fully extend his back.  (*Id*. at 26 ll. 3-13.)  Part of Andersson's evaluation noted that "[Leak] still complains of low back pain and has a mild decreased range of motion, but his MRI scans are completely normal."  (*Id*. at 28 ll. 5-7.)  Andersson concluded that the injections were unnecessary,[16] but that Leak should have received physical therapy.  (*Id*. at 29 ll. 7-10.)  Andersson further testified that the treatment Leak sought after the accident was not unreasonable.  (*Id*. at 60-64.)

Andersson saw Leak again on February 18, 2014.  (*Id*. at 33 ll. 18-21.)  At that examination Leak complained of lower back and leg pain, a progression that surprised Andersson.  (*Id*. at 34 ll. 2-11.)  Leak reported his near fall to Andersson, stating that his symptoms had increased and that he was back to the level of pain that he had before the radiofrequency ablation.  (*Id.* at 37 ll. 15-18, 38 ll. 3-9; Andersson Oct. 2016 Dep. at 37 ll. 11-18.)  Andersson reviewed Leak's January 2014 MRI and noted the disc protrusion, which he says indicated a mild degenerative change.  (Andersson Jan. 2016 Dep. at 38 ll. 13-24.)  Andersson

---

[16] While Andersson testified that he disagreed with the choice of Leak's treatment, he did not think it was unreasonable to treat him.  (Andersson Jan. 2016 Dep. at 64 ll. 15-23.)

testified that he did not think that the symptoms Leak was having in February 2014 related to the May 2013 accident because they were different from the symptoms he described at the August 2013 exam.[17]  (*Id.* at 46 ll. 5-13; Andersson Oct. 2016 Dep. at 41 l. 22-42 l. 1.)  Andersson further testified that Leak did not need surgery or any additional treatment or medication and that he had likely reached "maximum medical improvement" by October 2013 and was well enough to return to work.  (Andersson Jan. 2016 Dep. at 48 ll. 5-24; Andersson Oct. 2016 Dep. at 42 ll. 11-18.)  Andersson stated that he expected someone like Leak, with a moderate lumbar cervical strain, to recover in six to twelve weeks and that Leak appeared not to have responded well to treatment.  (Andersson Jan. 2016 Dep. at 82 ll. 2-23.)

*Dr. Sean Salehi*

Salehi saw Leak on May 27, 2014 for an initial consult as a referral from Dr. Vargas.[18]  (Salehi Dep. at 9 ll. 12-14, 12 ll. 3-5.)  Salehi reviewed Leak's three MRIs and indicated that the two taken on May 15, 2013 were normal and that the third, taken on January 14, 2014 revealed a bulging disc.  (*Id.* at 23 l. 6-24 l. 11.)  Salehi opined that it was more likely than not that the disc bulge was caused by the May 7 accident.[19]  (*Id.* at 26 l. 24-27 l. 2.)  Salehi also noted that at the time of his examination, Leak weighed 309 pounds and had a BMI of 45.8 and that his weight was a contributing factor to the disc bulge and his pain.[20]  (*Id.* at 16 ll. 23-24, 28 ll. 10-22.)

---

[17]  Andersson also testified that he did not think the near fall resulted in a change of symptoms. (Andersson Jan. 2016 Dep. at 69 ll. 11-13.)

[18]  At trial, Leak testified that he saw Salehi for a second opinion because Dr. Dickson had recommended "a very serious back surgery, and [he] did not know if that was the path [he] wanted" to take.  (Leak Trial Testimony at 21 ll. 2-5.)  He also testified that Salehi was not referred by any other physicians.  (*Id.* at 71 ll. 20-24.)

[19]  Salehi stated that the injury was subtle a week after the accident and so likely did not appear on the initial MRIs.  (Salehi Dep. at 33 ll. 15-22.)

[20]  A BMI of 45.8 indicates that a person is morbidly obese.  (Salehi Dep. at 17 ll. 17-19.)

Salehi did not recommend that Leak undergo surgery, and he did not see Leak again after the initial consult. (*Id*. at 28 l. 23-29 l. 1, 39 ll. 10-12.)

### 2013 Slip

Sometime after the ablations in November 2013, Leak slipped on wet or icy ground. (Leak Trial Testimony at 22 ll. 9-13.) After the slip, Leak testified that the pain "aggressively came back" and that pain lasted three to four months. (*Id.* at 23 ll. 9-10, 24 ll. 16-20.) After that period of time, Leak testified that his pain returned to the baseline level it had been before the slip. (*Id*. at 25 ll. 3-11.)

### Medical Bills

Leak asserts that the following expenses were incurred during the course of his treatment for the injuries he suffered as a result of the May 7, 2013 collision: (1) ambulance services from the Pilot truck stop to Advocate BroMenn Medical Center: $603.25 (Pl.'s Ex. 4); (2) emergency room care and testing at Advocate BroMenn Medical Center: $2,432 (Pl.'s Ex. 5); (3) unknown services at Pinnacle Pain Management in January 2015: $475 (Pl.'s Ex. 6); (4) two MRIs on May 15, 2013: $4,207 (Pl.'s Ex. 7); (5) treatment by Charles Bodem: $18,307.36[21] (Pl.'s Ex. 8); (6) emergency room care and pain medication at Edward Hospital in Naperville in July 2013:[22] 1,464 (Pl.'s Ex. 9); (7) physical therapy recommended by Dr. Andersson: $1,917.07[23] (Pl.'s Ex. 10); (8) January 2014 MRI: $1,300 (Pl.'s Ex. 11); (9) January 2014 lumbar discogram: $1,715 (Pl.'s Ex. 12); (10) treatments ordered by Dr. Vargas at Chicago Pain and

---

[21] By the Court's calculation, the charges reflected in plaintiff's Exhibit 8 total $18,361.31.

[22] Plaintiff testified that he went to Edward Hospital for a refill of pain medication because he could not get an appointment with Dr. Vargas for a refill. (Leak Trial Testimony at 32 ll. 16-21.)

[23] Exhibit 10 indicates that the physical therapy invoice was $1,971.07.

Orthopedic Institute: $17,066.09[24] (Pl.'s Ex. 13); (11) pain management treatment ordered by Dr. Vargas at Accredited Ambulatory Care: $90,719.83 (Pl.'s Ex. 14); (12) medical transportation to procedures ordered by Dr. Vargas: $598 (Pl.'s Ex. 15); (13) anesthesia provided by Metro Milwaukee Anesthesia: $8,691.73 (Pl.'s Ex. 17); (14) hot and cold therapy machine rental prescribed by Dr. Vargas: $7,225 (Pl.'s Ex. 18); and (15) medication from February 2014 to October 2014: $13,670.02 (Pl.'s Ex. 19). Leak asserts that the reasonable and necessary medical expenses he incurred total $170,479.35.[25] (Pl.'s Post-Trial Br. at 4.) It was established at trial that $74,475.19 of that medical care was paid as part of Leak's workers' compensation case. (*Id.* at 5; Pl.'s Ex. 36.)

**Time out of Work**

Leak's employment with Schneider was terminated on May 5, 2014. (Pl.'s Ex. 36.) Leak testified that he missed close to two and a half years of work recovering from the accident. (Leak Trial Testimony at 25 ll. 17-23.) He testified that the pain medications as well as having to be seated for long periods of time made it impossible for him to drive a truck. (*Id.* at 25 l. 21-26 l. 3.) Leak also testified that after the accident he was no longer able to walk for long periods of time, bowl, or go skating with his family. (*Id.* at 26 l. 21-27 l. 3.) He further stated that he had difficulties caring for his children and completing household chores. (*Id.* at 27 ll. 4-10.) Leak and his wife conceived a baby in August 2013, who was born in May 2014. (*Id.* at 64 ll. 2-9.) Leak cared for the newborn and his young stepdaughter until June 2015 while his wife worked. (*Id.* at ll. 11-20.) He testified that a neighbor and his aunt occasionally helped him with childcare. (*Id.* at 77 ll. 1-6.) Leak went back to work as a truck driver for All Access Trucking

---

[24] By the Court's calculation, the claim forms submitted as part of plaintiff's Exhibit 13 total $16,763.08.

[25] When the Court tallied the expenses claimed by plaintiff as laid out in his post-trial brief, the total was $170,391.35.

in August 2015.  (*Id*. at 28 ll. 18-23.)  He worked there through August 2016, when he started

working for FAB Express as a truck driver.  (*Id*. at 29 ll. 5-6, 30 ll. 3-10.)

**Workers' Compensation Benefits Paid by Schneider**

At the time of the accident, Leak testified that he was making about $900 a week, or about

$47,000 annually.  (Leak Trial Testimony at 61 ll. 6-14.)  From his start day with Schneider

(August 15, 2012) through the date of the accident (approximately thirty-eight weeks), Leak

made $34,140.07.  (Pl.'s Ex. 36.)  Leak was paid temporary total disability benefits of $616.20

each week from May 8, 2013 through March 10, 2014, for a total of $24,613.43.  (*Id.*; Leak Trial

Testimony at 72 ll. 10-14.)  Schneider paid an additional $74,475.19 for Leak's medical care.[26]

(Leak Trial Testimony at 72 ll. 22-25.)  Finally, Leak was paid $54,487.49[27] to settle his

workers' compensation claim.  (*Id*. at 73 ll. 4-9; Pl.'s Ex. 36.)  In sum, Schneider has a

$153,576.11 workers' compensation lien[28] as a result of this accident.  (Pl.'s Ex. 36.)

**CONCLUSIONS OF LAW AND APPLICATION OF FACTS TO LAW**

The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(1).  Plaintiff is

an Illinois resident seeking in excess of $75,000 in damages, and defendants are an Idaho citizen

and an Idaho corporation.  (Notice of Removal ¶¶ 6-8.)  "To recover damages based upon

negligence, a plaintiff must prove that the defendant owed a duty to the plaintiff, that the

defendant breached that duty, and that the breach was the proximate cause of the plaintiff's

---

[26] Based on a review of plaintiff's Exhibit 36, it appears that Schneider paid some of Leak's medical bills
through his termination in May 2014.

[27] Approximately $14,000 of the settlement went to attorney's fees.  (Leak Trial Testimony at 77 ll. 16-
20.)  Leak kept $40,000 of the settlement.  (*Id*.)  Schneider classified this payment as permanent partial
disability benefits.  (Pl.'s Ex. 36.)

[28] "[S]ection 5(b) of the Workers' Compensation Act (820 ILCS 305) [includes a] provision that an
employer who has paid worker's compensation benefits to its injured employee is entitled to a lien against
the employee's subsequent personal injury award for the injury."  *Mitchell v. Atwood Enters. Inc.,* 624
N.E.2d 878, 882 (Ill. App. Ct. 1993).

injury." *Krywin v. Chi. Transit Auth.,* 938 N.E.2d 440, 446 (Ill. 2010). Because defendants have admitted liability, the Court need only discuss causation and damages.

Plaintiff must prove by a preponderance of the evidence that defendant's negligence was the proximate cause of his injuries. *See Knights v. United States,* 203 F. Supp. 3d 916, 927 (N.D. Ill. 2016) (citing *Barnett v. Ludwig & Co.,* 960 N.E.2d 722, 730 (Ill. App. Ct. 2011)). "Proximate cause is 'that cause which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces the result complained of and without which the results would not have occurred.'" *Fowler v. United States,* No. 08 C 02785, 2014 WL 683751, at *12 (N.D. Ill. Feb. 21, 2014) (quoting *FDIC v. Bierman,* 2 F.3d 1424, 1434 (7th Cir. 1993)). The evidence shows that the collision was the proximate cause of Leak's injuries. Plaintiff testified that immediately after the collision he fell and had a sharp pain in his back. He contacted emergency personnel the day of the accident and two days later sought additional treatment. All of the medical professionals who treated Leak, including Dr. Andersson, concluded that plaintiff's pain and injuries before the slip were caused by the May 7, 2013 collision. Defendants attempt to discredit plaintiff by contradicting his testimony that he fell twice during the collision and had immediate pain, with his treaters' testimony that plaintiff did not report two falls and the EMT's testimony that plaintiff did not report head, neck, or back pain at the scene of the accident. (*See* Defs.' Post-Trial Br. at 3-8, 12.) While the Court notes the inconsistencies, it finds, particularly in light of the consensus among plaintiff's treaters, that plaintiff has proven by a preponderance of the evidence that the May 7 collision caused his pain and injuries.

Further, the Court finds that plaintiff's slip in late 2013 does not serve as an intervening event that breaks the causal chain. "Every natural consequence that flows from an injury . . . is compensable, unless caused by an independent intervening accident that breaks the chain of

causation[.]" *Vogel v. Indus. Comm'n,* 821 N.E.2d 807, 812 (Ill. App. Ct. 2005). The Illinois Appellate Court "has recognized repeatedly that, when the [plaintiff's] condition is weakened by a work-related accident, a subsequent accident that aggravates[29] the condition does not break the causal chain." *Id.* at 813. Moreover, "[i]t is irrelevant whether other incidents, work-related or not, may have aggravated [the plaintiff's] condition." *Glister-Mary Lee Corp. v. Ill. Workers' Comp. Comm'n,* No. 5-14-0241WC, 2015 WL 1816529, at *6 (Ill. App. Ct. Apr. 20, 2015). "Whether a causal connection exists between the [plaintiff's] condition and a particular . . . accident is a question of fact." *Nat'l Freight Indus. v. Ill. Workers' Comp. Comm'n,* 993 N.E.2d 473, 481 (Ill. App. Ct. 2013). The factfinder "determines which medical opinion to accept regarding causation, and it may attach greater weight to the treating physician's opinion." *Glister-Mary Lee Corp.*, 2015 WL 1816529, at *6.

When Leak first saw Dr. Vargas after the slip, he complained of increased pain, but testified that after about three or four months, his pain level was the same as it had been before the slip. Even though the MRI taken after the slip indicated a slight disc protrusion where there had not been one before, Dr. Salehi testified the protrusion would likely not have appeared on the initial MRIs because they were taken so soon after the accident. Moreover, Dr. Andersson testified that the difference in the January 2014 MRI was slight and reflected normal degenerative change in someone of Leak's age. Accordingly, the Court concludes that Leak's slip in late 2013 was not an intervening event that broke the causal chain. *See Steele v. Ill. Workers' Comp. Comm'n,* Case No. 1-14-3665WC-U, 2016 WL 562938, at *8-9 (Ill. App. Ct. Feb. 11, 2016) (finding that a subsequent, minor car accident did not break the causal chain

---

[29] Defendants characterize the slip as an aggravating event. (Defs.' Post-Trial Br. at 4.)

because plaintiff's symptoms and pain did not change and a second MRI indicated no material change).

**Medical Expenses**

Plaintiff "is entitled to recover reasonable medical expenses that are causally related to the accident and that are determined to be required to diagnose, relieve, or cure the effects of [the] injury." *F & B Mfg. Co. v. Indus. Comm'n of Ill.,* 758 N.E.2d 18, 24 (Ill. App. Ct. 2001). Plaintiff "has the burden of proving that the medical services were necessary and the expenses incurred were reasonable." *City of Chi. v. Ill. Workers' Comp. Comm'n,* 947 N.E.2d 863, 856 (Ill. App. Ct. 2011). "What is reasonable and necessary is a question of fact[.]" *F & B Mfg. Co.,* 758 N.E.2d at 24.

Bodem and Vargas treated plaintiff on a regular basis after the accident. They both testified that the course of Leak's treatment was reasonable and necessary. Dr. Andersson, who saw Leak on two occasions, testified that while he disagreed with Leak's course of treatment before the slip, he did not find it unreasonable. Defendants briefly address damages at the end of their post-trial brief and appear to argue that because plaintiff has not proven the accident caused his injuries, that he is not entitled to damages. (*See* Defs.' Post-Trial Br. at 16.) The Court relies on the testimony of the medical professionals who treated Leak regularly and finds that his treatment was both reasonable and proximately caused by the collision. Accordingly, the Court awards Leak $160,225.83 for the following in medical expenses: (1) $603.25: City of Bloomington ambulance; (2) $2,432: emergency room care and testing at Advocate BroMenn Medical Center; (3) $4,207: May 15, 2013 MRIs; (4) $11,978.23: treatment by Charles Bodem

through September 5, 2013;[30] (5) $1,971.07: physical therapy; (6) $1,300: January 14, 2014 MRI; (7) $1,715: January 30, 2014 lumbar discogram; (8) $16,763.08: diagnostics ordered by Dr. Vargas; (9) $90,719.83 for pain management ordered by Dr. Vargas; (10) $598: transportation to two medical procedures ordered by Dr. Vargas; (11) $8,691.73: anesthesia administered for procedures through January 30, 2014; (12) $7,225: equipment rental for hot and cold therapy; and (13) $12,021.64 for pain medication from February to May 2014.[31]

Finally, the Court declines to award plaintiff costs for emergency room care he received at Edward Hospital in July 2013 and pain medication or services he received at Pinnacle Pain Management in January 2015. Plaintiff testified that he went to the hospital in July 2013 for pain medication because he could not get in to see Dr. Vargas for a refill. Without more information, the Court finds it unreasonable for plaintiff to have sought a medication refill at the emergency room merely because he could not get an appointment soon enough with Dr. Vargas. The Court also finds it unreasonable to award plaintiff costs for the pain management bill for unknown services in January 2015 when he was last seen by Dr. Vargas in June 2014.

**Wage Loss**

"[T]he duration of TTD (temporary total disability) is controlled by [plaintiff's] ability to work and her continuation in the healing process[.] . . . [T]o be entitled to TTD, [plaintiff] must prove not only that [he] did not work, but that [he] was unable to work." *F & B Mfg. Co.*, 758 N.E.2d at 22. "The time during which a [plaintiff] is temporarily totally disabled, is a question of fact[.]" *Id.* Leak was making approximately $900 a week at the time of the accident and did

---

[30] Bodem testified that he discharged Leak from his care on September 5, 2013. Accordingly, the Court declines to award anything billed by Bodem, after that date.

[31] Dr. Vargas testified that he last treated plaintiff in June 2014. Accordingly, the Court declines to award plaintiff for medication billed after that date.

not work for Schneider from the date of the accident until his termination a year later. While Andersson testified that Leak was able to return to work by October 2013,[32] plaintiff argues that he is entitled to wages through November 2014, the last time he visited Chicago Pain.[33] (Pl.'s Post-Trial Br. at 12.) Leak became the primary caregiver for his newborn in May 2014, and last saw Dr. Vargas in June 2014. Relying on that evidence and testimony, the Court finds that plaintiff was able to return to work approximately a year after the accident. Accordingly, the Court awards plaintiff a year's salary—$46,800.

**Pain and Suffering**

"Under Illinois law, the court must award damages that will reasonably and fairly compensate the plaintiff for the injuries sustained as a result of the defendant's negligence." *Wolkenhauer v. Smith,* 822 F.2d 711, 714 (7th Cir. 1987). "When a federal judge is the trier of fact, he, unlike a jury, is required to explain the grounds of his decision." *Arpin v. United States,* 521 F.3d 769, 776 (7th Cir. 2008). "'This means, when the issue is the amount of damages, that the judge must indicate the reasoning process that connects the evidence to the conclusion.'" *Id.* (quoting *Jutzi-Johnson v. United States,* 263 F.3d 753, 758 (7th Cir. 2001)). In order to meet this requirement, the Seventh Circuit has instructed district judges to consider awards in similar cases despite the fact that the Illinois Supreme Court does not require or encourage such comparisons. *Id.* at 776-77 (explaining that "Illinois's rule on comparison evidence in damages cases does not bind the federal courts even in cases . . . where the rule of decision is given by Illinois law").

Plaintiff and his treaters testified that Leak suffered head, neck, and back pain as a result of the accident. (*See* Pl.'s Post-Trial Br. at 7-8.) The only evidence before the Court about

---

[32] Leak testified that prior to becoming a truck driver, he held many different jobs including one at Sears loading merchandise and another at Fed Ex as a package handler. (Leak Trial Testimony at 60 ll. 13-24.)

[33] There is no testimony that Leak was treated after June 2014.

plaintiff's ongoing pain and suffering is his brief trial testimony in which he stated that his back pain has been constant and at times it is sudden and sharp and other times it is dull. (Leak Trial Testimony at 27 ll. 22-25, 28 ll. 9-11.) Based on a review of other awards in similar circumstances, plaintiff's subjective complaints of pain, and his general testimony about ongoing pain, the Court awards plaintiff $15,000 in damages for pain and suffering. *See Wyletal v. United States,* 907 F.2d 49, 51 (7th Cir. 1990) (affirming district court's award of $10,000 in damages for pain and suffering when an elderly woman collided with a postal worker and broke her hip); *Jackson v. United States,* No. 97 C 1927, 1999 WL 259948, at *2 (N.D. Ill. Apr. 8, 1999) (awarding plaintiff $45,000 in past and future pain and suffering when he was hit by a postal vehicle, causing a permanent limp and pain); *Gregory v. Fed Ex Nat'l LTL, Inc.,* Case No. 14-cv-572-JPG-RJD, 2016 WL 5746265, at *7 (S.D. Ill. Oct. 4, 2016) (awarding $34,000 in damages for pain and suffering to plaintiff who injured his head, neck, and shoulder and suffered ongoing whiplash as a result of motor vehicle accident); *Lee v. Chi. Transit Auth.,* No. 1-15-3281, 2016 WL 6672078, at *4 (Ill. App. Ct. Nov. 9, 2016) (affirming trial court's denial of plaintiff's motion for a new trial when the jury awarded no damages for pain and suffering based on plaintiff's subjective complaints of pain).

**Loss of Normal Life**

"Loss of normal life means 'the temporary or permanent diminished ability to enjoy life . . . [and] includes a person's inability to pursue the pleasurable aspects of life.'" *Smith v. Altman,* No. 12 C 4546, 2015 WL 5610670, at *3 (N.D. Ill. Sept. 21, 2015) (quoting *Ocampo v. Paper Converting Mach. Co.,* No. 02 C 4054, 2005 WL 2007144, at *7 (N.D. Ill. Aug. 12, 2005)). Plaintiff presented limited evidence on loss of a normal life. He testified that he could no longer

run, bowl,[34] or go skating with his family. (Leak Trial Testimony at 26 l. 24-27 l. 3.) On the other hand, Leak testified that he helped conceive and was the primary caregiver for his newborn baby. Leak further testified that as he "progressed," he was able to go on family outings such as Disney on Ice and to the Shedd Aquarium and take trips to Wisconsin and Missouri. (*Id*. at 66 ll. 5-9, 69 ll. 14-17.) In the Court's view, plaintiff has not proven by a preponderance of the evidence that he experienced the loss of a normal life as a result of the accident. Accordingly, the Court declines to award plaintiff damages for loss of a normal life. *See Smith,* 2015 WL 5610670, at *6 (reducing a jury's award of $300,000 for loss of a normal life to $30,000 for a plaintiff who required a year of physical therapy, spinal fusion surgery, wore a neck brace for six months, and could no longer attend his children's musical performances); *but cf. Clanton v. United States,* Case No. 15-CV-124-NJR-RJD, 2017 WL 2637795, at *21-23 (S.D. Ill. June 19, 2017) (awarding $4,000,000 in damages for past and future loss of normal life when thirty-five year old plaintiff's treatment for hypertension deviated from applicable standard of care, causing kidney failure, dialysis, a kidney transplant, the likelihood of future transplants and dialysis, and a shortened life expectancy).

## CONCLUSION

For the reasons set forth above, the Court finds in favor of plaintiff and against defendant in the amount of $222,025.83.[35]

**SO ORDERED.**                                    **ENTERED:  June 29, 2017**

**JORGE L. ALONSO**
**United States District Judge**

---

[34] Plaintiff testified that he had not tried to bowl since the accident. (Leak Trial Testimony at 68 ll. 6-7.)

[35] In arriving at this number, the Court has added the damages awarded for medical expenses ($160,225.83), lost earnings ($46,800), and pain and suffering ($15,000).